UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR J. TONER, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>             v.<br><br>ROMEO POWER, INC. (f/k/a RMG ACQUISITION CORP.), LIONEL E. SELWOOD, JR., LAUREN WEBB, ROBERT S. MANCINI, PHILIP KASSIN, D. JAMES CARPENTER, STEVEN P. BUFFONE, W. GRANT GREGORY, W. THADDEUS MILLER, and CRAIG BRODERICK,<br><br>                              Defendants. | Case No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Victor J. Toner ("Plaintiff"), by Plaintiff's attorneys, on behalf of Plaintiff and all others similarly situated, alleges the following based upon the investigation by Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation by counsel included, among other things, a review of Romeo Power, Inc.'s ("Romeo" or the "Company") (f/k/a RMG Acquisition Corp. ("RMG")) public filings with the United States ("U.S.") Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, and publicly available trading data relating to the price and volume of Romeo securities.

## NATURE OF THE ACTION

1.      This action is a securities action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, brought by Plaintiff on behalf of a class of all persons and entities who purchased the

publicly traded securities of Romeo during the period October 5, 2020 through March 30, 2021, inclusive (the "Class Period").

2.      Romeo was founded in 2016 and, according to its SEC filings, purports to be an industry leading energy technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles.  Romeo asserts that through its industry leading energy dense battery modules and packs, it enables large-scale sustainable transportation by delivering safe, longer lasting batteries with shorter charge times.  Romeo's core product offering purportedly serves the battery electric vehicle ("BEV") medium duty short haul and heavy duty long haul trucking markets, as well as specialty trucking and buses.

3.      During the Class Period, Defendants represented that for 2020 Romeo estimated revenue of $11 million, and for 2021 Romeo estimated revenue of $140 million.  Defendants further represented that Romeo had "key partnerships" and close relationships with LG Chem, Samsung, Murata and SK Innovation, which manufacture battery cells, a key component in Romeo's battery modules and packs and that they were supplying Romeo with battery cells. Furthermore, Defendants represented that Romeo had the capacity and supply to meet end-user demand for Romeo's products, that Romeo was not beholden "to any level of the value chain", that its supply was hedged, and that it did not see any material challenges that would hamper growth.

4.      Unknown to investors, Romeo was suffering from an acute shortage of high quality battery cells, which are key raw materials for Romeo's battery packs and modules, because of supply constraints.  Contrary to Defendants' representations: (i) Romeo had only two battery cell suppliers, not four; (ii) the future potential risks that Defendants warned of concerning supply disruption or shortage had already occurred and were already negatively affecting Romeo's

business, operations, and prospects; (iii) Romeo did not have the battery cell inventory to accommodate end-user demand and ramp up production in 2021; (iv) Romeo's supply constraint was a material hindrance to Romeo's revenue growth; and (v) Romeo's supply chain for battery cells was not hedged, but in fact, was totally at risk and beholden to just two battery cell suppliers and the spot market for their 2021 inventory.  Given the supply constraint that Romeo was experiencing during the Class Period, Defendants had no reasonable basis to represent that the Company had the ability to meet customer demand and that it would support growth in revenue in 2021.

5.     On March 30, 2021, after the market closed, Romeo issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the quarter and year ended December 31, 2020, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that the Company's production had been hampered by a shortage in supply of battery cells and that its estimated 2021 revenue would therefore be reduced by approximately 71-87%.

6.     During a conference call with investors after the disclosure of Romeo's financial results and projected results, Defendant Lionel E. Selwood, Jr. ("Selwood, Jr.") disclosed that the Company had been relying solely on Samsung and LG for its supply of power cells.

7.     On March 31, 2021, Morgan Stanley issued a research report in which it downgraded Romeo's target price per share from $12 to $7.

8.     Also on March 31, 2021, Romeo shares declined from a closing price on March 30, 2021 of $10.37 per share to close at $8.33 per share, a decline of $2.04 per share, or almost 20%, on heavier than usual volume of over 20 million shares.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  During the Class Period Romeo's predecessor, RMG, resided and conducted business in this Judicial District, Romeo stock is listed and trades on the New York Stock Exchange ("NYSE") in this Judicial District, certain Defendants reside or conduct business in this Judicial District, and wrongful conduct took place in this Judicial District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.      Plaintiff, as set forth in the attached Certification, acquired Romeo's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Romeo is incorporated in Delaware and its current principal executive offices are located at 4380 Ayers Avenue, Vernon, California 90058.

16.     Defendant Selwood, Jr. is the Company's President and Chief Executive Officer ("CEO"), and a member of the Company's board of directors.

17.     Defendant Lauren Webb ("Webb") is the Company's Chief Financial Officer and a member of the Company's board of directors.

18.     Defendants Selwood, Jr. and Webb are referred to herein as the "Individual Romeo Defendants." The Individual Romeo Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Romeo's press releases and investor presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Romeo Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Romeo Defendants.

19.     Romeo and the Individual Romeo Defendants are referred to collectively as "Romeo Defendants".

20.    Defendant Robert S. Mancini ("Mancini") was the CEO and a member of the board of RMG and is a member of Romeo's board of directors.   Mancini signed the Registration Statement (defined below).

21.    Defendant Philip Kassin ("Kassin") was a member of the board of RMG and is a member of Romeo's board of directors.  Kassin signed the Registration Statement.

22.    Defendant D. James Carpenter ("Carpenter") was chairman of the board of RMG. Carpenter signed the Registration Statement.

23.    Defendant Steven P. Buffone ("Buffone") was a member of the board of RMG, and signed the Registration Statement.

24.    Defendant W. Grant Gregory ("Gregory") was a member of the board of RMG, and signed the Registration Statement.

25.    Defendant W. Thaddeus Miller ("Miller") was a member of the board of RMG, and signed the Registration Statement.

26.    Defendant Craig Broderick ("Broderick") was a member of the board of RMG, and signed the Registration Statement.

27.    Defendants Mancini, Kassin, Carpenter, Buffone, Gregory, Miller, and Broderick are referred to collectively as the "RMG Defendants".

28.    The Romeo Defendants and RMG Defendants are referred to collectively as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

29.    On February 12, 2019, RMG, a New York City-based special purpose acquisition company, or SPAC, announced that it closed its initial public offering of 20 million units at $10

per share, resulting in gross proceeds of $200 million.  The units began trading on the NYSE under the ticker symbol "RMG.U".  Each unit consisted of one share of the Company's Class A common stock and one-third of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.  When the shares of Class A common stock and warrants began separate trading, they traded on the NYSE under the symbols "RMG" and "RMG.WS."

30.    RMG was formed by Defendants Carpenter, Mancini, and Kassin, and was formed for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses in the diversified resources and industrial materials sectors.

31.    On October 5, 2020, RMG announced a definitive agreement for a business combination with Defendant Romeo that would result in Romeo becoming a publicly listed company.  Romeo was founded in 2016 and, according to its SEC filings, Romeo purports to be an industry leading energy technology company focused on designing and manufacturing lithium-ion battery modules and packs for commercial electric vehicles.  Romeo asserts that through its industry leading energy dense battery modules and packs, it enables large-scale sustainable transportation by delivering safe, longer lasting batteries with shorter charge times.  Romeo's core product offering purportedly serves the BEV medium duty short haul and heavy duty long haul trucking markets, as well as specialty trucking and buses.

32.    Upon closing of the transaction, the combined entity would be named "Romeo Power, Inc." and would remain listed on the NYSE and trade under the new ticker symbol "RMO" and its warrants would trade under the new symbol "RMO.WT".  Under the proposed transaction,

at closing, Romeo would receive approximately $340 million in cash, which was a combination of RMG cash and cash from a PIPE (private investment in public entity) investment.

33.     During the Class Period, Defendants represented that for 2020 Romeo estimated revenue of $11 million, and for 2021 Romeo estimated revenue of $140 million.  Defendants further represented that Romeo had "key partnerships" and close relationships with LG Chem, Samsung, Murata, and SK Innovation, which manufacture battery cells, a key component in Romeo's battery modules and packs and that they were supplying Romeo with battery cells. Furthermore, Defendants represented that Romeo had the capacity and supply to meet end-user demand for Romeo's products, that Romeo was not beholden "to any level of the value chain", that its supply was hedged, and that it did not see any material challenges that would hamper growth.

34.     On December 29, 2020, Romeo announced that it completed its business combination with RMG.  The business combination was approved by RMG stockholders in a special meeting held on December 28, 2020 and consummated on December 29, 2020.  Beginning on December 30, 2020, Romeo's common stock and warrants began trading on the NYSE under the new ticker symbols "RMO" and "RMO.WT".

### Materially False and Misleading Statements Issued During the Class Period

35.     The Class Period begins on October 5, 2020, when Defendants caused RMG to file with the SEC on Form 8-K an investor presentation dated October 2020.  Among other things, Defendants' October 2020 presentation represented that for 2020 Romeo estimated revenue of $11 million, and for ***2021 revenue of $140 million***.[1]  The October 2020 presentation represented that

---

[1] The statements quoted in this section in ***bold and italicized*** typeface are materially false and misleading for the reasons set forth herein.

Romeo's "extensive cell selection process allows the company to rigorously test hundreds of cells and choose only the best for each applications" and that their cell validation process was a "***Critical gating step for long-term commitments.***"

36.     On November 19, 2020, Defendants caused Romeo to file a November 2020 investor presentation with the SEC on Form 8-K, which repeated Romeo's revenue estimate for 2020 and 2021.

37.     On October 15, 2020, the RMG Defendants caused RMG to file a registration statement on Form S-4 with the SEC (the "Registration Statement").  The Registration Statement was amended on November 20, 2020 and December 4, 2020 on Form S-4/A.  The RMG Defendants signed the Registration Statement.

38.     The Registration Statement repeated Romeo's $140 million revenue estimate for 2021.

39.     The Registration Statement represented that the Company had a close relationship with its purported power cell providers:

**Suppliers**

Our products use parts that are sourced from suppliers across the world. ***We have developed close relationships with vendors of key components of our battery products, in particular battery cells*** . . . .

The price we pay for cells depends on a number of factors, including material grades of chemistry selected for cell recipe, volumes, ***long-term commitment***, logistics and shipping, and tariffs.

**Samsung**

Samsung is a leading global supplier of electrical products and components. Through its supply of power cells to Romeo, Samsung currently supports the EV Program and is a candidate for stationary storage ("ESS") applications. Samsung offers cylindrical and prismatic products.

**LG Chem**

LG Chem Ltd., often referred to as LG Chemical, is the largest Korean chemical company headquartered in Seoul, South Korea. LG Chem supplies Romeo with power cells, offers cell selection for non-EV Program and is an ESS candidate. LG Chem offers cylindrical and pouch products.

**Murata**

Murata Manufacturing Co., Ltd. is a Japanese manufacturer of electronic components. Murata is the best in market power cell for sports cars. ***Murata supplies Romeo with power cells*** and offers cylindrical and pouch products.

**SK Innovation**

SK innovation is Korea's first and largest energy chemical company. ***SK supplies Romeo with power cells*** and offers pouch products.

40.     The Registration Statement contained a generic warning of potential future risks relating to "***Increases in costs, disruption of supply or shortage of any of our battery components, particularly cells, could harm our business***":

> From time to time, we may experience increases in the cost or a sustained interruption in the supply or shortage of our components. ***Any such increase or supply interruption could materially and negatively impact our business, prospects, financial condition and operating results.*** The prices for our components fluctuate depending on market conditions and global demand and ***could adversely affect our business, prospects, financial condition and operating results.*** For instance, we are exposed to multiple risks relating to price fluctuations for battery cells. These risks include, but are not limited to:
> - the inability or unwillingness of our suppliers and their competitors to build or operate cell production facilities to supply the numbers of cells required to support the growth of the electric vehicle industry as demand for such cells increases;
> - disruption in the supply of cells due to quality issues or recalls by the cell manufacturers;
> - ***a fewer number of manufacturers of cells; and***
> - ***an increase in the cost of raw materials.***
>
> ***Any disruption in the supply of battery cells could temporarily disrupt production of our products until a different supplier is fully qualified*** . . . .

41.     On December 10, 2020, RMG filed a proxy statement/consent solicitation statement/prospectus with the SEC on Form 424B3, which incorporated and formed part of the

Registration Statement.  On December 10, 2020, the SEC declared the Registration Statement effective.

42.     On December 15, 2020, the Individual Romeo Defendants participated in an online interview in which Defendant Webb stated the following regarding the Company's ability to meet customer demand:

> **[Defendant] Webb**: Our current business plan assumes that we will fulfill all of the demand for the 1.6 billion in revenue out of our existing factory. ***And we have the space and the capacity here to do that***. One of the reasons we chose this location was because we could expand incrementally to make sure that we were being smart with the capital expenditures we were making. ***So at this point we run one full line and we have the ability to put up to 10 more pack line, excuse me, module pack combinations here in order to accommodate that amount of demand. So while we may look at the opportunities to expand past that, we don't have a reason to do so to fulfill the business orders that we have, or even what we see in the near term pipeline through 2025.***

43.     Defendant Selwood, Jr. further explained during the December 15 interview as follows:

> **Kristi Marvin**: It's challenging to keep up actually, but here it is. Hi, do you see any issues with securing enough cells to fulfill your large orders, especially as your order book grows into the billions?
>
> **[Defendant] Selwood Jr.**: Sure. And that goes back to the Formfactor and cell supplier agnosticism, right? So that's probably the least cool reason why we do it, to ensure that we have drop-in replacements that are already identified. ***So every time we talk to our customers or we do our testing, there's a primary cell, there's a secondary cell and there's a tertiary cell.*** Okay? And we've approached our relationships from a technical one, so there's technical respect between us and our suppliers from the cell level. ***And now we're focused on securing our capacity for the long term. So I don't see any big challenges as our order book continues to grow.***

44.     Defendant Selwood, Jr. further explained during the December 15 interview as follows:

> **Kristi Marvin**: . . . So next question, how does the company deal with the tight supply of raw materials for batteries? Does the company have long-term contracts to guarantee supply?

**[Defendant] Selwood Jr.**: *Yes. So we're currently putting those in place.* We consider this as Operation Hedge Fund and we do this all the[] way at the component level. The reason we started this is quite frankly, some of the PCBA components have anywhere from 54 week lead time to 72 week lead time. ***So we implemented Operations Hedge Fund program in our supply base that allows us to secure products that's needed for the long.***

45.     Defendant Selwood, Jr. further explained during the December 15 interview as follows:

**Kristi Marvin**: Okay, great. I'm going to go back to Lionel now. There's a question here asking you to speak to your supply chain model and material sourcing. And what are your competitive advantages around that?

**[Defendant] Selwood Jr.**: . . . So just like the configurability in our design, our strategy's the same in a supply base. So on a sale, like I said before, foreign practice [c]ell supplier agnostic. It's the same with the raw materials and the other stuff as well. So we go for a supply base that can support our way from our clean sheet design to prototype before mass production launch. So maintaining that flexibility, again. ***Every part within the bill of materials has a primary identified, which most likely have a longterm partnership with, a secondary and tertiary option just to enable flexibility as we scale up and scale down.***

46.     On December 30, 2020, Defendant Selwood, Jr. participated in an interview on CNBC and stated:

**Defendant Selwood, Jr.**: . . . So, we are the foundational technology, we are the nucleus of electrification, and that's what makes us different. You get exposure to the entire vertical. ***We're not beholden to*** any one customer, ***or any one part of the value chain.***

47.     On February 25, 2021 Defendant Selwood, Jr. participated in an online interview with Alan Adler, Detroit Bureau Chief, FreightWaves and stated:

**Alan Adler**: . . . I want to start out our conversation and talk a little bit about your area, which is batteries. They are critical to the growth in electric vehicles. Where do you see, as we talk about supply chain here, where do you see the potential chinks in the supply chain, such as we're seeing, say, with semiconductors in automobiles? Where are those potential hiccups?

**Defendant Selwood, Jr.**: . . . we actually stood up a program that's, you know, kind of tongue-in-cheek, Alan, called "Operation Hedge Fund," ***where on a weekly basis we look out in the open market and if there's something that we see,***

*something that's 56 weekly time or 72 weekly time lead times being pushed out, we actually grab it on the open market and put it on the shelf* . . . .

**Alan Adler**: So, hedge fund is an accurate description of what you did. You were hedging against supply that was a pretty smart move. So, it turns out.

**Defendant Selwood, Jr.**: And let me expand – what we noticed again, just to – no matter how big your buy was, you know, you will have multi-billion dollar, you know, partners of ours that we're growing together and they would be indicating to us that "hey even though we spent X amount of billions last year, our lead times are consistently being pushed out" and we're there in stealth mode, and we said "hey we know that we have a great product and we'll eventually capture a big market share, *so we need to grab these so we're not lying down." So, that's what drove it.*

48.     Also during the February 25, 2021 interview, Defendant Selwood, Jr. further discussed Romeo's business plan in which they have "deliberately built partnerships up and down the value chain - whereas with fleet managers" explaining that "*we wanted to be flexible from a value chain standpoint; to not be beholden to any level of the value chain*; to agitate up and down opportunities; and to be in a conversation short, medium and long-term."

49.     The statements referenced above were materially false and/or misleading because at the time Defendants made these representations, Romeo was experiencing a constrained supply of battery cells.  Contrary to Defendants' representations: (i) Romeo had only two battery cell suppliers, not four; (ii) the future potential risks that Defendants warned of concerning supply disruption or shortage had already occurred and were already negatively affecting Romeo's business, operations, and business prospects; (iii) Romeo did not have the battery cell inventory to accommodate end-user demand and ramp up production in 2021; (iv) Romeo's supply constraint was a material hindrance to Romeo's revenue growth; and (v) Romeo's supply chain for battery cells was not hedged, but in fact, was totally at risk and beholden to just two battery cell suppliers and the spot market for their 2021 inventory.  Given the supply constraint that Romeo was experiencing during the Class Period, Defendants had no reasonable basis to represent that the

Company had the ability to meet customer demand and that it would support growth in revenue in 2021.

## The Truth Begins to Emerge

50.     On March 30, 2021, after the market closed, Romeo issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the quarter and year ended December 31, 2020, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that the Company's production had been hampered by a shortage of battery cells and that its estimated 2021 revenue would therefore be reduced by approximately 71-87%:

> Regarding our 2021 outlook, we expect that our near term production and revenues will be constrained by the shortage in supply of battery cells. As the electric vehicle industry has experienced massive acceleration in recent months, the demand for raw materials and cells has outpaced supply. We expect that this cell shortage will result in Romeo Power's full year 2021 revenues being materially lower than originally projected. While frustrated, by this delay in bringing our solutions to market, we are working diligently with our preferred cell supply partners to secure allocation and continuous cell innovation for the near-intermediate and longer-term . . . .

> **2021 Outlook**

> As global electrification of the powertrain has hit an inflection point, the industry is experiencing a massive acceleration in growth and the demand for raw materials is outpacing supply. Romeo Power is currently subject to these supply constraints and, as a result of the significant shortfall in battery cell capacity industrywide, Romeo Power now expects its revenue for 2021 to be in the range of $18-40 million. The Company is currently pursuing extensive discussions with several preferred providers regarding establishing long-term cell supply agreements . . . .

51.     On the March 30, 2021 conference call with investors and analysts, Defendant Selwood, Jr. revealed, contrary to its prior representations, that the Company had been relying solely on Samsung and LG for its supply of power cells:

> **Adam Jonas**: . . . I just kind of want to hear how that went down, when you first realized there was a serious problem with the supply that cut the revenue, **because**

**part of the story I thought was you know, you have four suppliers, four main cell suppliers well down to your selection process from I get you get the 100 and 10 to 4 and part of the investment thesis on this is that, because you had spread out these relationships across the four the best [c]ell suppliers in the world, that we could have really managed the risk or at least had visibility on something like this.** So I'm curious, when did it first come up and was it all four cell suppliers at the same time? Or is there kind of a disproportionate just dependency on one or two of them? My first question.

**Lionel Selwood, Jr.**: Hey, Adam. Thanks again for joining us. **So, just a quick clarification, four part numbers, not four different cell suppliers, so our, our preferred cell suppliers that we -- that we put in the forecast are LG and Samsung**, okay. I just wanted to clarify from those two suppliers.

(Emphasis added).

52.    On March 31, 2021, Morgan Stanley issued a research report in which it downgraded Romeo's target price per share from $12 to $7 and stated the following:

> When we initiated on RMO at UW on February 12th our concerns around the battery pack business centered mainly on competition. While we have expressed concerns around potential industry-wide battery shortages in the next few years, we had not contemplated this risk to hit RMO in its very first quarter as a public company. Following management guidance on revenue, opex/R&D/capex and other items, we have made material downward revisions to our forecasts and price target and reiterate our UW rating . . . .

> While the company says it is aggressively pursuing paths to achieve long term supply contracts with key cell providers, given the risks in doing so we believe investors should allow for a high degree of margin of safety and should have a significantly better risk/reward before investing in the shares.

53.    On March 31, 2021, Romeo shares declined from a closing price on March 30, 2021 of $10.37 per share to close at $8.33 per share, a decline of $2.04 per share, or almost 20%, on heavier than usual volume of over 20 million shares.

54.    Romeo's stock has not recovered, closing at $7.92 per share on May 5, 2021.

## LOSS CAUSATION/ECONOMIC LOSS

55.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Romeo's share price and

operated as a fraud or deceit on Class Period purchasers of Romeo securities by misrepresenting Romeo's financial condition, results of operations, and business prospects.  Defendants achieved this by making false statements, while they knew or at least recklessly disregarded that the Company was experiencing material negative conditions that impaired its financial condition, results of operations, business prospects, and market price of its shares.  Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Romeo securities fell precipitously as the prior artificial inflation came out of Romeo's share price.

56.    As a result of their purchases of Romeo securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e*., damages under the federal securities laws.

57.    As a direct result of the public revelations regarding the truth about the condition of Romeo's business and the negative adverse factors that had been impacting Romeo's business during the Class Period, the price of Romeo's shares materially declined.  This drop removed the inflation from Romeo's share price, causing real economic loss to investors who purchased the shares during the Class Period.

58.    The decline in Romeo's share price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Romeo's share price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## ADDITIONAL SCIENTER ALLEGATIONS

59.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issues or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Romeo, their control over, and/or receipt and/or modification of Romeo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Romeo, participated in the fraudulent scheme alleged herein.

60.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Romeo Defendants.

61.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior officers or directors of Romeo or RMG, issued statements and press releases on behalf of Romeo, and had the opportunity to commit the fraud alleged herein.

## NO SAFE HARBOR

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of Romeo who knew that those statements were false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded securities of Romeo (f/k/a RMG) during the Class Period (the "Class").

65.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the U.S.  As of December 31, 2020, Romeo had over 126 million shares of common stock outstanding, which were actively traded on the NYSE in an efficient market.

66.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities

litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

69.     At all relevant times, the market for Romeo's securities was an efficient market for the following reasons, among others:

(a)     The Company's securities met the requirements for public listing and were listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly issued press releases which were carried by national news wires, and each of these releases was publicly available and entered the public marketplace; and

(d)     A number of securities analysts, including Morgan Stanley and Cowen and Company, regularly followed and analyzed the Company, and issued reports concerning the Company.

70.     As a result, the market for the Company's publicly traded securities promptly digested current information with respect to Romeo from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the Company's publicly traded securities during the Class Period suffered similar injury through their purchase of the publicly traded securities of Romeo at artificially inflated prices and a presumption of reliance applies.

## **COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

71.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

72.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Romeo's publicly traded securities during the Class Period.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Romeo's publicly traded securities.  Plaintiff and the Class would not have purchased Romeo securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

75.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Romeo securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Romeo Defendants)**

76.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

77.     The Individual Romeo Defendants acted as a controlling person of Romeo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Romeo Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Romeo Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, the Individual Romeo Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, Romeo and the Individual Romeo Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Romeo Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Romeo's and the Individual Romeo Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 6, 2021                                        Respectfully submitted,

                                                          POMERANTZ LLP

                                                          */s/ Jeremy A. Lieberman*
                                                          Jeremy A. Lieberman
                                                          J. Alexander Hood II
                                                          James M. LoPiano
                                                          600 Third Avenue
                                                          New York, New York 10016
                                                          Telephone: (212) 661-1100
                                                          Facsimile: (212) 661-8665
                                                          jalieberman@pomlaw.com
                                                          ahood@pomlaw.com
                                                          jlopiano@pomlaw.com

                                                          *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I,   VICTOR TONER                    , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Romeo Power, Inc. ("Romeo Power" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Romeo Power securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Romeo Power securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Romeo Power securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed    4/12/21

         (Date)

_____
          (Signature)

Victor J Toner

_____
     (Type or Print Name)

VICTOR J TONER.

**Romeo Power, Inc. (RMO)**                                                          **Toner, Victor**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/8/2021 | 10 | $21.3800 |
| Purchase | 2/9/2021 | 50 | $20.0100 |
| Purchase | 2/17/2021 | 6 | $15.6900 |
| Purchase | 2/19/2021 | 9 | $15.4400 |
| Purchase | 2/23/2021 | 49 | $12.4500 |
| Purchase | 2/24/2021 | 25 | $13.0700 |
| Purchase | 2/25/2021 | 16 | $13.1900 |
| Purchase | 2/26/2021 | 10 | $12.5000 |
| Purchase | 3/1/2021 | 10 | $12.8500 |
| Purchase | 3/4/2021 | 11 | $11.0300 |
| Purchase | 3/8/2021 | 12 | $9.7200 |
| Purchase | 3/16/2021 | 50 | $13.0400 |
| Purchase | 3/25/2021 | 10 | $11.5100 |
| Purchase | 3/29/2021 | 20 | $10.7300 |